**CRITICAL MASS ENERGY PROJECT, Plaintiff,**

v.

**NUCLEAR REGULATORY COMMISSION, Defendant,**

**Institute of Nuclear Power Operations, Defendant–Intervenor.**

**Civ. A. No. 84–1943.**

United States District Court, District of Columbia.

March 2, 1990.

Eric Glitzenstein, David Vladeck, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for plaintiff.

Catherine Lanctot, Susan K. Rudy, Elizabeth A. Pugh, Dept. of Justice, Civil Div., Washington, D.C. (Carolyn F. Evans, Office of Gen. Counsel, of counsel), for defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This FOIA case is once more before the Court on cross-motions for summary judgment following remand from the court of appeals.[1] The plaintiff, a consumer organization, is requesting copies of certain reports presently furnished voluntarily to defendant Nuclear Regulatory Commission ("NRC") by a former stranger to this litigation, the Institute of Nuclear Power Operations ("INPO"). INPO has, since remand, intervened as a co-defendant. Although this case bids fair to rival the saga of *Washington Post Co. v. U.S. Department of Health and Human Services*,[2] the Court will once again grant defendants' motion and dismiss the complaint.

### I.

INPO is a private non-profit consortium of electric utility companies operating nuclear power plants in the United States. It produces, and circulates to its membership, the reports at issue which present the results of its own inquiries into significant safety-related events or experiences occurring at its members' nuclear power plants. INPO also furnishes copies of its reports to the NRC, upon the express condition, however, that NRC not make them public without INPO's consent, and INPO does not consent to plaintiff's request here. NRC has, thus, invoked FOIA's Exemption 4, 5 U.S.C. §§ 552(b)(4), to justify its refusal to comply with that request.[3]

The court of appeals found the INPO reports to possess all the characteristics of documents entitled to Exemption 4 status save one, and remanded for this Court's factual determination as to whether their disclosure pursuant to FOIA request would compromise a governmental interest sought to be served by the Exemption 4, either by impairing NRC's ability to obtain the reports in the future (specifically, information of the same quality they presently impart), or by diminishing NRC's own regulatory efficiency or effectiveness. *Critical Mass Energy Project*, 830 F.2d at 287.

### II.

The determination mandated by the court of appeals requires "balanc[ing] the individual litigant's [i.e., the requestor's] need for information against the government's need to obtain the information in the future," *Washington Post Co.*, 690 F.2d at 258, and "the *extent* to which the government's ability to obtain [the] information would be impaired ... against the public interest in disclosure." *Id.* at 269 (emphasis in original).[4] It also necessitates a prediction of sorts as to the nature of the INPO/NRC relationship without the protection of a

1. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 644 F.Supp. 344 (D.D.C.1986), *vacated and remanded*, 830 F.2d 278 (D.C.Cir. 1987).

2. Civ. No. 80–1681, Mem. Op. (D.D.C. Dec. 4, 1980), *reversed and remanded*, 690 F.2d 252 (D.C.Cir.1982), *on remand*, 603 F.Supp. 235 (D.D.C.1985), *reversed and remanded*, 795 F.2d 205 (D.C.Cir.1986), *on remand*, Mem.Op. (D.D.C. Nov. 20, 1987), *reversed and remanded*, 865 F.2d 320 (D.C.Cir.1989).

3. Ironically, had the same reports been prepared directly by NRC's own investigators, using INPO's sources and techniques, they would likely be immune from disclosure under FOIA's Exemption 5. *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984); *Badhwar v. U.S. Dep't of the Air Force*, 829 F.2d 182 (D.C.Cir.1987).

4. The Court assumes that the "balancing" to be undertaken in Exemption 4 cases is an exception to, or at least a qualification of, the no-balancing rule generally observed in other FOIA contexts. *See Soucie v. David*, 448 F.2d 1067, 1076–77 (D.C.Cir.1971).

FOIA exemption for INPO reports in NRC's possession.

Yet despite the bulk of the record before the Court, it is largely unrevealing as to how the defendants would react to a decision rendering the INPO reports disclosable under FOIA, other than INPO's unequivocal confirmation of the fact that one certain consequence will be the cessation of its practice of sharing them with NRC voluntarily.[5] Thenceforth NRC would have to resort to compulsion to get the reports, and, INPO declares, it would resist vigorously (and it represents that it is informed its individual members will resist as well).

NRC and INPO are nevertheless fully in accord in one respect: the limited confidentiality the INPO reports presently enjoy, i.e., their general unavailability to the public at large, is indispensable to the quality of the information they contain. A host of declarants and affiants from both NRC and INPO (all of whom are highly qualified nuclear professionals possessing both years of relevant experience and the responsibility of currently relevant office) ardently attest to the importance of that circumstance as assuring maximum candor on the part of INPO's sources for the substance of its reports.[6]

The Court also perceives the position taken by NRC in this dispute as being more than perfunctory lip service to its commitment to INPO not to divulge the reports. From the NRC declarations alone it is apparent that NRC is convinced that it will experience a genuine loss of valuable regulatory intelligence, one way or another, if the INPO reporting process is made subject to general public scrutiny. NRC believes that it is now deriving from the INPO reports, and contemporaneously with

the industry itself, the most insightful thinking of the best informed prople within the industry on matters of safety, a commodity otherwise unavailable to it except through the good offices of an unofficial, industry-friendly organization such as INPO.

For its part plaintiff suggests no particularized need of its own for the reports. It is thus remitted to the general public interest in disclosure for disclosure's sake to support its request. To be sure, the public has an interest of significantly greater moment than idle curiosity in information bearing upon the safety of nuclear power plants. But so does NRC, and so do INPO and its members, and of a much more immediate and direct nature, in addition to their share of the general public interest.

Plaintiff also offers no affirmative evidence of its own to contradict defendants' declarants and affiants as to the importance of the information to the NRC, as to the extent to which NRC's ability to obtain it might be impaired were the INPO reports to be made public, or as to whether the NRC would be otherwise diminished in efficiency or effectiveness thereby. Plaintiff's case consists entirely of common sense inferences it asks the Court to draw from seeming concessions made by NRC to several of its discovery initiatives. The gist of those inferences is that the assertions of the NRC and INPO declarants and affiants are not to be credited, or at least not taken at face value.

For example, plaintiff argues, INPO members are already required to submit "licensee event reports" to NRC which are routinely made available to the public, although often containing revelations of hu-

---

5. INPO disclaims, for the present, any intention to stop preparing the reports altogether.

6. NRC and INPO contend that the true value of the reports to the industry (and to NRC) lies not in the factual information they impart but, rather, in the insight they afford as to "root causes" of the events and experiences which are frequently found to involve human error. The INPO personnel who compile the reports endeavor to get members' officials and plant per-

sonnel having knowledge of such events and experiences to engage in subjective self-critical or colleague-critical "rumination" about them. Were the reports to become public, candor would suffer, and, hence, diminish the value of the reporting process itself to INPO, to NRC, and ultimately to the public. *See, e.g.,* the affidavits of T.J. Sullivan (INPO) of August 26, 1988, and Edward L. Jordan (NRC) of October 28, 1988.

man error, yet are conceded by defendants to be truthful as far as they go.[7] Moreover, plaintiff suggests, candor on the part of sources interviewed by INPO is more likely to be inhibited by fear of summary discipline or reprisal by an employer (or NRC) than by apprehension of eventual public exposure for confessions of job-related mistakes. Yet nothing about the current reporting process protects an INPO source's anonymity from any of the multiple intra-industry recipients of the reports, including the source's own employer.[8] Finally, plaintiff observes, NRC wields the whip hand: not only does it have subpoena and near-plenary regulatory powers should it choose to use them to get the INPO reports, NRC can also effectively hold the licenses of INPO members hostage until it gets what it wants, in terms of candor, from anyone in the industry.

### III.

The Court finds the effect of the defendants' multiple declarations and affidavits, in the aggregate, to exceed the sum of their parts, and to carry defendants' burden of establishing entitlement to the exemption they claim for the INPO reports. Taken together they evince a symbiosis in the relationship between NRC and INPO which the Court foresees as being damaged were the INPO reports in NRC's possession to be subject to FOIA disclosure. Whether or not the reporting process would truly experience a loss of candor— an issue neither more declarations nor a parade of witnesses could definitively resolve in advance of the event—both NRC and INPO share the conviction that it would. The consequence would be that the information now freely shared by INPO with NRC would be withheld until it was demanded under some form of compulsion. The demand would have to be enforced, which would likely precipitate both acrimony and some form of litigation with attendant expense and delay.

NRC and INPO would then no longer be collaborators in a quest for optimum industry safety, putting aside their other regulatory differences. If not outright antagonists, they would at best be wary allies, working independently of one another, duplicating one another's efforts, and mistrustful of one another's initiatives or overtures. That deterioration of the relationship, in this Court's opinion, represents a sufficient showing that NRC's efficiency and effectiveness would be impaired were it not permitted to honor its commitment to INPO to keep the INPO reports in confidence, and it is, therefore, this 2nd day of March, 1990,

ORDERED, that defendants' motion for summary judgment is again granted; and it is

FURTHER ORDERED, that the complaint is, once more, dismissed with prejudice.

---

7. The relationship between the "licensee event reports" and the INPO reports at issue, for defendants' purposes, is illustrated by T.J. Sullivan's affidavit of February 20, 1990, and the declaration of Jack E. Rosenthal (NRC) of February 21, 1990, filed *in camera* post-hearing under seal at the Court's request. In certain respects that relationship resembles that of hospital records of patient care to peer review committee proceedings of particular cases. *See*

*Bredice v. Doctors Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.1970), *aff'd,* 479 F.2d 920 (D.C.Cir.1973).

8. Among other representations made by NRC or INPO for the first time at oral argument, which had nowhere found direct expression in their written submissions earlier, is one to the effect that INPO reports never beget discipline for sources from either an employer or NRC. It is now confirmed by the T.J. Sullivan affidavit of February 20, 1990.